Marc E. Kasowitz (mkasowitz@kasowitz.com)
Albert Shemmy Mishaan (amishaan@kasowitz.com)
Sondra D. Grigsby (sgrigsby@kasowitz.com)
Jeffrey Ephraim Glatt (jglatt@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.:    (212) 506-1700
Fax:    (212) 506-1800

*Attorneys for Plaintiff Robert D. Press*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Robert D. Press,<br><br>          Plaintiff,<br><br>                v.<br><br>Patrick J. Primavera,<br><br>          Defendant. | Civil Action No. 1:21-cv-10971 |

**COMPLAINT**
(Jury Trial Demanded)

Plaintiff Robert D. Press ("Press" or "Plaintiff"), for his complaint against defendant Patrick J. Primavera ("Primavera" or "Defendant"), upon knowledge as to himself and otherwise upon information and belief, alleges as follows:

## PRELIMINARY STATEMENT

1.      This action arises out of a fraudulent scheme orchestrated by Patrick Primavera, the former managing director of the New York office of TCA Fund Management Group Corp. ("TCA Investment Manager"), an international investment firm, to falsely inflate the size of the New York office's business -- and thereby earn substantial compensation and bonuses to which he was not entitled -- by representing to Robert Press, the firm's founder, and senior management, that the New York office was transacting substantial investment banking business -- and earning substantial investment banking fees -- for numerous clients for which it was in fact doing no such work and earning no such fees.  Nevertheless, for the period between 2017 and 2019, Primavera fraudulently concealed that scheme from Press and senior management by using false accounting and bookkeeping entries to reflect nonexistent investment banking fees from multiple clients on multiple transactions.  Strikingly, none of those false transactions and fees were discovered by TCA Investment Manager's internal accountants or outside auditor, one of the country's largest and most prestigious accounting firms.

2.      Primavera's wrongdoing began to come to light in 2020, after a whistleblower complaint was filed and an internal investigation commenced.  To cover his tracks and shift the spotlight away from himself, Primavera concocted a false narrative in which he sought to absolve himself from any responsibility and to improperly place the blame on Press and others. Primavera brazenly brought that scheme to the Securities & Exchange Commission ("SEC"), where he presented a false affidavit which triggered federal investigations and enforcement actions.

3.      The fallout from, and attempted cover-up of, Primavera's nefarious and wrongful conduct, coupled with the failure of internal accounting staff and outside auditors of TCA Investment Manager and its offshore and onshore feeder funds[1] to detect the fraud perpetrated by Primavera, has been devastating.  Such egregious misconduct and audit failures have resulted in, among other things, the collapse of the TCA Funds, a Cayman Islands liquidation proceeding, an SEC receivership proceeding, and numerous SEC enforcement actions.  The damage to Press has been enormous.

4.      Primavera was hired, in 2016, following the decision by Press and other upper management to expand TCA Investment Manager's business into investment banking, a business unit that would operate out of TCA Investment Manager's New York office to assist clients with performing agreed upon investment banking services in exchange for a fee set forth in a written investment banking services agreement ("IBSA").  Press hired Primavera to manage the New York office and hire and run a team responsible for, *inter alia*, originating investment banking clients for TCA Investment Manager, and negotiating, drafting, and executing IBSAs with investment banking clients on behalf of the TCA Investment Manager.

5.      One of Primavera's key responsibilities was to allocate each portion of the investment banking fee to be paid by a client to a specific performance obligation, record and book the investment banking fees earned by TCA Investment Manager for reporting to Press and upper management, and prepare and issue invoices to investment banking clients for services rendered by TCA Investment Manager.  Primavera was responsible for reporting IBSAs

---

[1] The offshore fund, TCA Global Credit Fund, Ltd. (the "TCA Offshore Feeder Fund"), and the onshore fund, TCA Global Credit Fund, LP (the "TCA Onshore Feeder Fund") were feeder funds to **Error! Main Document Only.**TCA Global Credit Master Fund, LP (the "TCA Master Fund").  The term "TCA Feeder Funds" refers to TCA Offshore Feeder Fund and TCA Onshore Feeder Fund together.  The term "TCA Funds" refers to the TCA Feeder Funds and the TCA Master Fund together.

originated, the amount of investment banking fees booked, and the results of collectability assessments to the internal accounting staff (the "Internal Accountants") of TCA Investment Manager.  Such reporting was performed in order to recognize and derecognize revenue in accordance with applicable accounting standards and record the appropriate amount of investment banking fees earned as an input to the computation of the net asset value ("NAV") by the administrator for the TCA Funds each month for ultimate disclosure to investors on monthly statements.

6.       By 2017, Press had developed a substantial organizational infrastructure at TCA Investment Manager consisting of more than 40 employees, with a seasoned team of financial and accounting professionals to oversee investment banking and internal accounting functions. In addition, Press had engaged one of the world's largest and most prominent accounting firms (the "Outside Auditor") to audit the financial statements of the TCA Funds to detect fraud or other improprieties in connection with, among other things, the booking of revenue from investment banking fees for which Primavera was principally responsible.  It goes without saying that Press relied on managers such as Primavera to deliver honest services and dutifully perform their jobs.  This reliance was even more pronounced in Primavera's case, as Press resided and worked from TCA Investment Manager's offices in Florida, was traveling internationally and working from the London office quite frequently, and, therefore, relied on remote reporting from Primavera that he was performing his duties properly in the manner he reported to Press and other members of upper management.  Press was not involved in the rendition of the investment banking services, and relied upon Primavera and his team to faithfully discharge those responsibilities and fully and accurately report results of their performance.

7.     Through an internal investigation after Primavera left TCA Investment Manager, Press was shocked to learn that, contrary to Primavera's ongoing verbal and written reports and representations to Press and upper management, neither Primavera nor anyone else had been performing the investment banking services for the firm's investment banking clients that Primavera said he had been performing.  Further, Press was equally shocked to learn that the Outside Auditor had failed to detect Primavera's gross misconduct in its audit procedures in 2017 and 2018, and that the conclusion in the auditor's written audit finding reports, which had routinely been given to Press and upper management, that it found no evidence of fraud or illegality, were shockingly wrong.

8.     In an outrageous effort to escape responsibility for the fraud he had perpetrated on Press, TCA Investment Manager and its clients, Primavera sought to blame Press for his own fraud and deceit.  Primavera submitted a false and perjurious declaration to the SEC defaming Press, and he defamed Press to other third parties.  Primavera claimed that Press, not he, was responsible for the fraud he had concocted concerning fake investment banking transactions, even though emails and other documentary evidence overwhelmingly demonstrate not only that Primavera was responsible for that fraud, but that he had actively and fraudulently concealed it from Press and upper management.

9.     Press brings this action to recover the damages he has suffered, including the enormous damage to his professional reputation, including severed business relationship and future economic opportunities, as a result of Primavera's calculated and fraudulent misconduct, including his egregious defamation of Press's professional reputation and character.

## THE PARTIES

10.     Plaintiff Robert D. Press is an individual domiciled in the State of Florida.

11.    Defendant Patrick J. Primavera is an individual domiciled in the State of New Jersey.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of one or more States and a citizen of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.    This Court has personal jurisdiction over Primavera, among other things, (i) by virtue of Primavera's business and personal activities within, and contracts with, the State of New York and this Judicial District; and (ii) a substantial portion of Primavera's misconduct described herein occurred in New York.

14.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), since a substantial part of the events giving rise to the claims occurred in New York and in this Judicial District.

## BACKGROUND

### A.    ROBERT D. PRESS AND THE TCA INVESTMENT MANAGER

15.    Press's career spans more than three decades in finance.  He began his career in the Capital Markets Group of Chemical Bank and rose to become one of the heads of global derivative products trading.  During his extensive career, Press has been a principal in asset management, brokerage and investment banking companies, and has served on industry panels and as an officer and director of public and private companies.  Press's diverse background includes years of experience in structured finance, asset-backed lending, securitizations, and mergers and acquisitions, within the United States and Europe.

16.    Press is the founder and former Chief Executive Officer and director of TCA Investment Manager, and was the owner of TCA Investment Manager at all relevant times.  TCA

Investment Manager was headquartered in Aventura, Florida and had offices in New York, Las Vegas, London, England, and Melbourne, Australia.

17.     Under Press's leadership for a decade, TCA Investment Manager served as, among other things, an investment adviser to the TCA Funds.  TCA Investment Manager had multiple revenue streams and in 10 years Press had developed a network of contacts and referral sources spanning over 6 continents.  Additionally, the TCA Master Fund was a master-feeder fund that supported the trading and investing activities of the TCA Feeder Funds.  The TCA Feeder Funds invested substantially of their assets in the TCA Master Fund.  As of on or about November 30, 2019, the TCA Master Fund had approximately 470 investor accounts and a published net asset value of over $500 million.

18.     As the investment adviser of the TCA Funds, TCA Investment Manager provided portfolio management services to the TCA Funds and also had discretionary authority to invest the assets of the TCA Funds.

**B.     PRESS HIRES PRIMAVERA TO LEAD THE TCA INVESTMENT MANAGER'S NEW YORK OFFICE AND MANAGE INVESTMENT BANKING FUNCTIONS**

19.     In or around July 2016, Press hired Patrick Primavera, whom he believed to be duly qualified based upon his stated skills, abilities, knowledge, and experience, to be the Managing Director of the New York office.  Primavera began his employment as Managing Director of TCA Investment Manager's New York office in or about September 2016 at a six-figure annual base salary, with additional compensation incentives including an annual discretionary six-figure bonus.  As Managing Director, Primavera was in charge of hiring, running, overseeing, and supervising a team of financial professionals responsible for, among other things:  (i) originating investment banking clients, (ii) negotiating, drafting, and executing IBSAs with investment banking clients, (iii) preparing written scopes of work ("SOW")

outlining the specific investment banking services to be performed for an investment banking client pursuant to the IBSAs on behalf of the TCA Investment Manager, (iv) performing investment banking services for investment banking clients pursuant to the IBSAs, (v) recording and booking the investment banking fees earned pursuant to IBSAs in a monthly pipeline (the "Investment Banking Pipeline") and other periodic reports given to Press and upper management, (vi) preparing and issuing invoices to investment banking clients for services rendered under IBSAs, (vii) conducting collectability assessments on the ability of an investment banking client to pay investment banking fees, and (viii) reporting IBSAs originated, the amount of investment banking fees booked, and the results of collectability assessments to the Internal Accountants.

20.     In connection with the investment banking services, among his other responsibilities, Primavera was responsible for handling the client relationships.  The IBSAs required the client companies to pay an investment banking fee to the TCA Master Fund for the investment banking services provided by the TCA Investment Manager through Primavera and his team.  The investment banking fees the companies paid would vary from deal-to-deal depending on the investment banking services the companies contracted for and required.

21.     The investment banking services TCA generally offered included, among other things:  (i) identifying merger-and-acquisition opportunities, (ii) reviewing organization charts and other information regarding the structure of the company, (iii) reviewing employee files, credentials, and background checks, (iv) reviewing incorporation documents, by-laws, minutes of board and committee meetings, (v) reviewing agreements and information regarding stocks and shareholders, (vi) preparing business plans, financial models, and discussing the budgeting and forecasting process, (vii) assisting with finding appropriate legal counsel and reviewing

engagement letters, summaries of litigation or arbitration claims and proceedings, (viii) assisting with SEC reports, (ix) discussing governmental, environmental, and equal opportunity employment compliance issues, (x) assisting with identifying and reviewing trademarks, copyrights, and other issues with intellectual property, (xi) assisting with financial and accounting matters including reviewing audited financial statements, tax returns, and correspondence with the IRS, and (xii) assisting with sales and marketing including identifying potential customers and discussing future product and services trends.  Press believed Primavera's stated knowledge and experience running his own business prepared him to handle these types of investment banking services.

22.     After a brief transitional period from a prior investment banking manager who became an outside consultant, Primavera assumed ultimate responsibility for all aspects of the investment banking services and fees beginning in or about 2017.  Primavera hired a team of staff members who reported to him and whose primary responsibility at the TCA Investment Manager was to perform the investment banking services.  Primavera often lamented to Press that he was so busy that he could not keep up with the growing demand for investment banking services and needed to hire additional staff.  To meet such purported demands, Primavera hired as many as 10 employees in the New York office and created the outward appearance to Press that Primavera and his team were performing the investment banking services sufficient to support his monthly bookings of millions of dollars in investment banking fees.

23.     Primavera was also tasked with working with and reporting to other TCA Investment Manager's employees in the accounting and finance department -- the Internal Accountants.  These Internal Accountants were supposed to ensure that TCA Funds's accounting was done accurately and in accordance with all applicable rules and guidelines.  They were also

responsible for performing monthly reviews of Primavera's monthly progress reports that contained the IBSAs, investment banking fees, and his proposal of the amount of investment banking fees to book for the calculation of the NAV for the TCA Funds.

24.     TCA Investment Manager's internal accounting department was responsible for analyzing the investment banking fees and obligations, performing a review of the same every single month, and performing cash flow analyses.  If the TCA Investment Manager had not performed any investment banking services that month and the clients were not invoiced, its policy provided that the accountants would de-recognize that revenue.

25.     Though Primavera had made it clear to Press and upper management that he was performing the investment banking services, in reality he had secretly delegated much of his work on the investment banking services to the former investment banking manager who was working as an outside consultant (the "Former IB Manager").  Unbeknownst to Press and upper management, while Primavera ran the New York office and worked with accounting to book the investment banking fees, the Former IB Manager was regularly designated as the main contact for the clients, negotiated many of the IBSA deals, and performed the actual investment banking services work.  Together, Primavera and the Former IB Manager would put a value on the services for the investment banking fees and do an evaluation on the collectability of the investment banking fees in order to ensure the client companies could afford the services.

26.     Press trusted Primavera and the team Primavera put together with the management and performance of investment banking services, giving Primavera autonomy to manage the New York office and his team as he saw necessary to ensure the investment banking services were performed and booked properly.

27.     Primavera voluntarily departed in 2019, following four years of the delivery of purported honest services to the TCA Investment Manager.  Subsequently, Press learned in 2020 after an internal investigation was underway following a whistleblower complaint that his reposal of trust in Primavera was sorely misplaced.

C.     **PRIMAVERA'S FRAUD AND MISCONDUCT ARE REVEALED IN AN INTERNAL INVESTIGATION**

28.     In or about early January 2020, Press received notice that two people from TCA Investment Manager filed a whistleblower complaint with the SEC.  Shocked and unware of any underlying facts that could support such a complaint, Press had the TCA Investment Manager immediately contact the SEC for details regarding the allegations and instructed the TCA Investment Manager's lawyers to launch a side-by-side internal investigation into TCA Investment Manager's accounting and reporting practices (the "Internal Investigation").

29.     The Internal Investigation revealed a troubled and fraudulent pattern of activity orchestrated and perpetrated by Primavera and assisted by the Former IB Manager and Internal Accountants.  Contrary to what Primavera consistently reported to Press and recorded in the TCA Investment Manager's books and records and Investment Banking Pipeline reports, there were no material investment banking services provided by him or the employees he managed in the New York office in 2017, 2018, or 2019 and Primavera intentionally misrepresented that such services were being performed to the TCA Investment Manager's upper management, including to Press.

30.     Throughout the course of his tenure as Managing Director of the TCA Investment Manager's New York office, Primavera made false and misleading misrepresentations to Press regarding, *inter alia*, the Former IB Manager's role, the productivity of the office, the department's workflow, collectability of the investment banking fees, and that he was sending

10

monthly invoices to each investment banking client.  He also knowingly misrepresented investment banking fees collections and investment banking services performance on invoices and scope of work summaries.

31.     As a result of Primavera's misrepresentations regarding the provision of investment banking services by the TCA Investment Manager, investment banking fees were booked by the TCA Investment Manager that in reality were never earned.  Primavera's fraudulent booking caused improper revenue recognition, and artificially inflated the NAV disseminated to TCA investors on a monthly basis.

32.     Contrary to Primavera's consistent representations to Press and upper management, no discernible investment banking services or consulting were being performed by him or his team for the vast majority of deals that the New York office originated.  In many cases, clients that Primavera and the Former IB Manager signed up for investment banking services did not need investment banking services at all.  In fact, and unbeknownst to Press, it was common for the Former IB Manager and the investment banking services team to tell perspective clients wanting to take out a loan that the TCA Master Fund would not give them a loan unless they executed an IBSA.  They would solicit new business for the IBSA by assuring the clients that if the TCA Master Fund did not give them the loan they would never have to pay the investment banking fees -- a term that was not in the standardized IBSAs -- but that the IBSA must be signed in order for the TCA Master Fund to even consider giving them the loan.  Or, if the client was planning to acquire or be acquired by another company, the Former IB Manager or Primavera would promise the client that if the acquisition did not go through, it would not have to pay the investment banking fees.

33.     Additionally, most of the IBSAs Primavera and his team were responsible for listed investment banking fees that were uncollectable.  In many cases, the IBSAs were signed with companies that did not have sufficient credit to get a loan with the TCA Master Fund, much less pay a six- or seven-figure fee for investment banking services, and many were told by Primavera or the Former IB Manager that the listed investment banking fees would not need to be paid.  On information and belief, Primavera and his team were aware when getting the companies to enter into the IBSAs and when booking the purported value that the investment banking fees would not be collectable.

34.     The Outside Auditor, as TCA Funds's outside and independent auditors, should have uncovered Primavera's scheme through its audit procedures during its review of the files for the audit of the 2017 and 2018 financial statements.  However, the Outside Auditor did the exact opposite and ultimately confirmed it found no evidence of fraud or illegal conduct in connection with its audits.

35.     Any questions the Outside Auditor had about the IBSAs, investment banking services, and investment banking fees, were routinely answered by Primavera -- the primary perpetrator of the hidden fraud.  For example, in connection with the audit, the Outside Auditor sent investment banking services clients audit confirmations and the clients would often respond that the investment banking services were not being performed, that they did not actually need any investment banking services, that they did not get a loan and did not need to pay the investment banking fees, or simply value the investment banking services at $0.  Primavera explained the responses away by claiming the clients were small businesses and not sophisticated in the ways of investment banking and therefore did not understand the audit confirmations.  Primavera said he would work with the clients to clear up the confusion.  Instead of speaking to

the clients or properly reviewing the files and the investment banking paperwork, the Outside Auditor neglected its duties as independent auditor and apparently accepted and were satisfied by Primavera's explanations.

36.     Press and upper management relied upon Primavera's representations and the audit opinions and findings from the Outside Auditor that the investment banking fees were recognized properly and no fraud or illegal acts were detected.  Indeed, the Outside Auditor issued written audit finding reports in 2018 and 2019 to Press and upper management that they found no evidence of fraud or illegality in connection with the 2017 and 2018 audits.

37.     The Internal Investigation also revealed that the TCA Investment Manager's accounting department did not perform any cash flow analyses in 2019 for the majority of investment banking deals, nor did they perform any monthly financial analyses for the majority of investment banking deals in the fourth quarter of 2018 -- unbeknownst to Press.  Like Primavera, the TCA Investment Manager's accounting department never reported any collectability, booking, or compliance issues to upper management or Press.  To the contrary, they routinely reported the opposite to Press -- that the accounting for collections and collectability was fully in compliance with the applicable standards.

38.     Further, unbeknownst to Press, the TCA Investment Manager's accounting managers and Internal Accountants ratified Primavera's premature booking of unearned investment banking Fees in the NAV that were disseminated to investors in the TCA Funds.

39.     The fact that the TCA Investment Manager's accounting department approved the NAV inputs that included the investment banking fees purportedly earned by Primavera and his team on a monthly basis as compliant with applicable accounting standards, led Press, upper management, and the outside directors into reasonably believing that the revenue had been

13

properly recognized.  On information and belief, Primavera worked with accounting and the Internal Accountants to purposefully conceal the truth from Press.

40.     While the Internal Investigation uncovered a multitude of examples where Primavera lied to Press and upper management about the nature and order of magnitude of the investment banking services performed and investment banking fees collected, two examples in particular illustrate the pervasive practice by Primavera and his team and highlight the moral depravity of his fraud.

41.     First, in or about November 2018, "Company A," seeking capital to purchase another company, engaged the TCA Master Fund as their banker to provide both debt and equity funding for the purchase.  As part of its due diligence, Primavera claimed to have performed a valuation analysis on the acquisition and he and his team prepared a summary banking report stating Company A's financials had been reviewed for affordability of the investment banking services.

42.     The TCA Investment Manger entered into an agreement with Company A to, *inter alia*, assist and advise of the creation of a business plan and marketing materials and establish and implement a working model for the company.  Primavera signed the IBSA on behalf of the TCA Investment Manager with compensation for the investment banking services set at $500,000.

43.     Although Company A's IBSA, executed on November 29, 2018, stated that the full amount of the $500,000 was not due upon execution and instead that the TCA Investment Manager would provide it with monthly invoices payable within 30 days from their receipt, Primavera recorded the entire $500,000 for the investment banking services in the November 2018 Investment Banking Pipeline when no work had been performed.  The TCA Investment

Manager's Internal Accountants approved the inclusion of the $500,000 revenue booking in the NAV that was published to investors in the TCA Funds.

44.     Additionally, as late as April 2019, the TCA Investment Manager's file for Company A, managed by Primavera and his team, reflected one SOW attached to an invoice indicating that even months later none of the agreed upon work had been completed.  The Internal Investigation revealed there is no record of the invoice being sent to Company A.  To the contrary, Company A maintained that it did not receive investment banking services and therefore did not owe TCA Investment Manager for those services.  In fact, when Company A was contacted by the Outside Auditor to confirm the investment banking fees owed in March 2019, it crossed out $500,000 and stated that $0 in investment banking fees were outstanding and due and payable to TCA Investment Manager.  Indeed, Company A never went into underwriting or paid the due diligence fee to TCA Investment Manager.

45.     Primavera never made Press aware that the investment banking services for Company A were not performed or that the purported $500,000 in investment banking fees was improperly booked in November 2018.

46.     The second example is even more egregious.  In 2019, Primavera, his team, the Former IB Manager, and the Internal Accountants corroborated together to book a total of $4,250,000 of investment banking fee income over the span of several months for another company, "Company B," despite knowing they never performed any actual investment banking services for Company B.

47.     On March 31, 2019, Primavera and his team executed an IBSA with Company B, which stated that Company B would compensate the TCA Investment Manager for $5,000,000 in investment banking services and the full amount would not be due upon execution of the

15

agreement but instead the TCA Investment Manager would provide it with monthly invoices payable within 30 days from their receipt.

48.     However, Primavera booked $500,000 of Company B's purported investment banking fees in April 2019, booked $2,400,000 a month later in May 2019, $150,000 in June 2019, $200,000 in July 2019, $250,000 in August 2019, and finally $650,000 in September 2019. Primavera and his team booked a total of $4,250,000 in investment banking fees for Company B.

49.     Despite the astronomical amount of investment banking fees Primavera booked, the Internal Investigation revealed that there are no invoices in the TCA Investment Manager's file for Company B, and there was only one invoice sent to Company B on May 31, 2019, for $10,000 for investment banking fees.  Additionally, there was nothing in the SOW for Company B that was marked as having been completed despite the total projected work valued at $5,000,000 and booking $4,250,000.  The Internal Accountants approved the NAV numbers that included these booking of Company B's investment banking fees.

50.     Primavera and his staff also prepared an overview of collectability for Company B which provided that based on their initial review of the company's financial, they could afford the $5,000,000 obligation in the IBSA.  But the Internal Investigation revealed that there were in fact no company financials or bank statements in Company B's file that could support its ability to pay the investment banking fees.

51.     Primavera never made Press aware that the investment banking services for Company B were not performed or invoiced, or that the purported $4,250,000 investment banking fees was improperly booked throughout 2019.

52.     The Internal Investigation also revealed that Primavera falsely touted that he and his team had improved the collectability of the investment banking fees to Press and upper management.

53.     In total, the Internal Investigation found that of all the companies Primavera and his team were responsible for their investment banking services, they had improperly booked investment banking fees for the overwhelming majority of them.  Primavera had consistently represented to Press and upper management in discussions and the Investment Banking Pipelines that work for these companies' investment banking services was being performed and completed according to their SOW documentation.  Primavera lied to everyone at the TCA Investment Manager above him and hid the Former IB Manager's continued involvement in the investment banking services for years.

54.     Even though Primavera concealed his fraud from Press and upper management, the Outside Auditor, as the outside auditor and last line of defense that the Press relied upon, should have detected that Primavera was not actually performing investment banking services for the vast majority of investment banking fees that he booked when it began its audit procedures, particularly when it began receiving audit confirmation letter responses from investment banking client companies stating that no fees were owed to the TCA Investment Manager because no services had been performed.  Had the Outside Auditor conducted the audits in 2017 properly, the improper recognition of investment banking revenue would have been detected and Press would have stopped that practice and ensured that the investment banking managers and the Internal Accountants were fired and that the correct revenue recognition practices and policies were followed in 2018 and going forward.

**D.    PRIMAVERA'S DEFAMATION TO COVER HIS FRAUD AS TO THE
INVESTMENT BANKING FEES**

55.    As outlined above, Primavera and his team were responsible for signing clients up
for investment banking services, determining whether or not the fees would be collectable,
managing the investment banking services, performing the investment banking services, and
recognizing the proper value of the investment banking services for the TCA Investment
Manager's books and records.  In that capacity, Primavera and his team would show Press the
IBSAs with his monthly Investment Banking Pipeline reports, assuring him that the clients had
signed and determining the amount of the investment banking fees that should be booked.  Press
granted Primavera autonomy to manage the investment banking services in the New York office,
and trusted Primavera and his handpicked team to deliver honest work.

56.    When Press was notified about the whistleblower complaint in 2020 and he
initiated the Internal Investigation, Press had no idea Primavera and his team were fraudulently
and inappropriately entering into the IBSAs and booking the investment banking fees' value
without completing the work or collecting the fees.  During the course of the Internal
Investigation, Primavera's fraud was first discovered and later his ill-fated attempt to cover his
tracks and shift the spotlight away from himself by concocting and disseminating a fictional
narrative to improperly place the blame on Press and others.

57.    On information and belief, Primavera submitted a declaration to the SEC dated
December 22, 2020 (the "Declaration") regarding his purported experiences while working as
the Managing Director for the TCA Investment Manager's New York Office in connection with
the SEC's investigation.  In the Declaration, Primavera falsely and defamatorily blames Press for
Primavera's own fraudulent conduct.  In the Declaration, Primavera falsely informed the SEC
that the New York office "did not have an investment banking department" and "never had any

investment bankers on staff or anyone else who could provide the investment banking [s]ervices called for under the [IBSAs]."  Primavera further told the SEC that Press was aware of the lack of experience in the New York office regarding investment banking services because Press purportedly interviewed and helped hire the personnel in New York and knew that Primavera did not have investment banking experience.

58.     Each of these statements was false and Primavera was aware the statements were false.  Press specifically hired Primavera to run the New York office and ultimately tasked him with managing investment banking services and hiring the appropriate staff.  As discussed above, the investment banking services the TCA Investment Manager offered were limited merger-and-acquisitions work suited to the needs of its client base, and Primavera's experience running his own business should have prepared him to handle the job.  Primavera and his team purposefully kept Press and upper management in the dark -- lying about the Former IB Manager's continued involvement and misrepresenting the work and collections Primavera claimed he and his team had done in emails to Press as well as asking Press if more staff could be hired to deliver on the purportedly growing demand for the investment banking services.

59.     Primavera also purposefully fabricated the claims made to the SEC that Press overruled Primavera, unilaterally determined the value of the investment banking services to be booked as he saw fit and when to close the Investment Banking Pipeline for any given month, and that Press would improperly cause him to include deals from the next month for the previous month.  Each of these statements was false.  Press entrusted Primavera with valuing the investment banking services based upon the purported work Primavera and his team performed, and left booking the investment banking fees for those services to Primavera and the TCA accounting team.

60.     Primavera's fraudulent statements about Press's involvement in Primavera's fraud had no basis in fact.  Press relied in good faith that his managers such as Primavera would deliver honest services and dutifully perform their positions.  This reliance was more than reasonable as Press resided and worked from TCA Investment Manager's offices in Florida, was traveling internationally and working from the London office quite frequently, and, therefore, Primavera remotely reported to Press that he was performing the duties of his position and purposefully and deceptively hid from Press and other members of upper management any information that would contradict his representations.  While Press of course wanted the new investment banking program to succeed and meet its goals of profitability to maximize returns for the investors of the TCA Funds, he was not involved in the rendition of the investment banking services and relied upon Primavera and his team to autonomously perform the same and accurately report results of the performance of such obligations to Press and other members of upper management.

61.     Primavera also falsely claimed to the SEC that Press was aware of the financial condition of the companies that signed IBSAs and knew most of the investment banking fees recorded were uncollectable.  To the contrary, Press was not involved in the day-to-day workings of the investment banking services and agreements and relied on the information Primavera provided to him about the financial status of the clients, the IBSAs, invoices, and investment banking fees.  Primavera purposefully misrepresented and hid information from Press that would have alerted him to the truth.  Press believed the IBSAs were executed in good faith and the clients required the investment banking services they were being offered, and throughout 2018, Press added additional resources to improving invoicing and collections of the investment

20

banking fees to assist Primavera's team, including hiring a bookkeeper in or about November 2018.

62.     Primavera knowingly and maliciously defamed Press to the SEC to avoid liability for his own wrongdoing.

63.     Ultimately, Press, as the leader of TCA, was compelled to reach a settlement with the SEC, without admitting or denying any of the substantive allegations, in order to put this matter behind him.

## COUNT 1
### (Defamation Per Se)

64.     Press restates each and every allegation of the foregoing paragraphs as if fully set forth herein.

65.     As detailed above, through Primavera's December 22, 2020 Declaration to the SEC, Primavera published or caused to be published multiple false statements of fact about and concerning Press that are defamatory.

66.     The false and defamatory statements about Press included statements that Press: was aware the TCA Investment Manager's New York office "did not have an investment banking department" and "never had any investment bankers on staff or anyone else who could provide the investment banking [s]ervices called for under the [IBSAs]" and that Press knew Primavera could not do any investment banking services work because Primavera "did not have investment banking experience"; had "constant discussions" with Primavera "about the New York Office not having the staff available to provide [investment banking] services to companies"; "would not close the [Investment Banking] Pipeline for the month until the middle of the following month because he wanted to include more deals"; would assign a monetized value to be logged as investment banking services for the work the New York sales team and

claimed he could value investment banking services as he saw fit and had Primavera calculate

the value of the investment banking services on his own; and "was aware of the financial

condition of the companies that signed [IBSAs] and knew most of the [investment banking] fees

recorded were uncollectable."

67.     Additionally, Primavera made false and defamatory statements concerning Press

claiming that Press was responsible for determining the monetary value of the investment

banking services included in the Investment Banking Pipelines and not Primavera.

68.     Primavera caused these false statements to be repeated to third parties including

the SEC.

69.     The foregoing statements are per se defamatory because they accuse Press of

wrongdoing and impugn his reputation in his profession, business, and/or trade.

70.     The defamatory statements expose Press to public contempt, hatred, ridicule,

aversion, disgrace, and/or deprivation of friendly intercourse in society.

71.     Every defamatory statement identified herein is categorically false, and contained

or created the impression of, facts that are false and which malign Press's honesty, ethics,

trustworthiness, dependability, and/or professional or business abilities.

72.     Primavera's publication of these false and defamatory statements was neither

privileged nor authorized in any way, and these statements were published or caused to be

published maliciously, knowingly, and/or with extreme recklessness, and without justification.

73.     Primavera acted with actual malice in publishing these defamatory statements.  At

the time the statements were published, Primavera knew they were false or acted with reckless

disregard for their truth or falsity.

74.     Press has suffered and will continue to suffer extensive economic and reputational injury, including *per se* injury, by reason of Primavera's defamation.  Primavera's defamatory statements have harmed and/or have a likelihood of harming Press by ruining his business, livelihood, and ability to support himself and his family and causing, among other things, third parties to refuse to engage in any new business dealings with Press, lost revenue and profits, increased expenses, legal fees, and cost expended to mitigate the impact of Primavera's dishonesty.  As a direct and proximate result of the publication of these false and defamatory statements, Press has suffered millions of dollars of monetary damages, including damage to his personal dignity, his professional and personal reputation and livelihood, and has also suffered anguish and humiliation among other damages.

75.     Press, consequently, seeks both compensatory and punitive damages, in an amount to be determined at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Press demands judgment against Primavera, awarding Press as follows:

(a)     Damages to be determined at trial, including compensatory damages of not less than $75,000 and punitive damages of not less than $75,000;

(b)     Cost and disbursements of this action, together with attorneys' fees, where provided for by law;

(c)     Pre-judgment interest and post-judgment interest available under law; and

(d)     Such other and further relief as the Court may deem just and proper.


**TRIAL BY JURY**

Trial by jury is demanded on all issues so triable.


Dated: New York, New York
           December 21, 2021

                          KASOWITZ BENSON TORRES LLP

                          By:   _/s/ Marc E. Kasowitz_____
                                 Marc E. Kasowitz
                                 (mkasowitz@kasowitz.com)
                                 Albert Shemmy Mishaan
                                 (amishaan@kasowitz.com)
                                 Sondra D. Grigsby
                                 (sgrigsby@kasowitz.com)
                                 Jeffrey Ephraim Glatt
                                 (jglatt@kasowitz.com)


                                 1633 Broadway
                                 New York, New York 10019
                                 Tel.:  (212) 506-1700
                                 Fax:   (212) 506-1800

                                 *Attorneys for Plaintiff Robert D. Press*