UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT D. PRESS,

                    Plaintiff,

      -against-

PATRICK J. PRIMAVERA,

                    Defendant.

Case No. 1:21-cv-10971 (JLR)

**OPINION AND ORDER**

---

JENNIFER L. ROCHON, United States District Judge:

      Plaintiff Robert D. Press ("Plaintiff") brings this diversity action against Defendant Patrick J. Primavera ("Defendant") alleging defamation for statements made to the U.S. Securities and Exchange Commission ("SEC"). *See* ECF No. 1 ("Compl."). Now before the Court is Defendant's motion to dismiss the Complaint on the grounds that his statements made to the SEC are absolutely privileged because they were made in the course of a quasi-judicial proceeding. *See* ECF No. 28 ("Br."); ECF No. 35 ("Reply"). Plaintiff opposes the motion. *See* ECF No. 33 ("Opp."). For the reasons set forth below, the Court DENIES Defendant's motion to dismiss.

## BACKGROUND[1]

      Defendant Primavera is a former Managing Director of the New York office of TCA Fund Management Group Corp. (the "TCA Group" or "TCA Investment Manager"), an investment firm founded by Plaintiff. Compl. ¶ 1. Defendant was hired by Plaintiff in approximately July 2016 as "Managing Director of TCA Investment Manager's New York office," and began in his role in September 2016. *Id.* ¶ 19. In that role, he oversaw employees

---

[1] Unless otherwise noted, the facts stated herein are taken from the Complaint and accepted as true for purposes of Defendant's motion.

who were responsible for a vast array of tasks associated with investment banking, including locating clients, crafting and executing investment bank services agreements ("IBSAs"), preparing written scopes of work ("SOW"), performing the investment banking services for clients, recording fees earned and other reports for Plaintiff and other management, issuing invoices to clients for services rendered, "conducting collectability assessments on the ability of an investment banking client to pay investment banking fees," and reporting to internal accountants statistics about IBSAs, fees, and results of the collectability assessments. *Id.* ¶¶ 4, 19. In 2017, Defendant "assumed ultimate responsibility for all aspects of the investment banking services and fees . . . ." *Id.* ¶ 22. Those fees included an "investment banking fee to the TCA Master fund" for the services the company provided, *id.* ¶ 20, which encompassed identifying potential transactions, and reviewing organizational charts, employee documents, financial models, and budgets of clients' companies, *id.* ¶ 21. While he was Managing Director, Defendant hired a staff of ten and was responsible for reporting to internal accountants. *Id.* ¶¶ 22-23. Plaintiff gave Defendant "autonomy" over the New York office. *Id.* ¶ 26. According to Plaintiff, during Defendant's employment, Defendant secretly entrusted his responsibilities to a former employee, who was then acting as an outside advisor. *Id.* ¶ 25. Defendant ultimately left the company in 2019. *Id.* ¶ 27.

      In January 2020, Plaintiff learned that a whistleblower complaint was filed with the SEC about his company. *Id.* ¶ 28. Plaintiff does not allege that Defendant filed that complaint. At Plaintiff's request, lawyers for the TCA Group initiated an internal investigation to look into the allegations in the whistleblower complaint, an investigation Plaintiff characterizes as being conducted "side-by-side" with the SEC investigation. *Id.* Plaintiff alleges that the internal investigation revealed that Defendant had engaged in a "fraudulent pattern of activity" in which,

assisted by the outside advisor and internal accountants, Defendant and his employees did not provide any "material investment banking services" to their clients. *Id.* ¶ 29. This was contrary to reports given to management and to what was reflected in the TCA Group's books. *See id.* According to Plaintiff, Defendant had made a series of false or misleading statements to Plaintiff and upper management, including but not limited to, statements about his role, the outside advisor's role, what his office was doing, and the fees collected by his office. *Id.* ¶ 30; *see also id.* ¶¶ 32, 45-51 (alleging misrepresentations by Defendant about banking and consulting services); ¶¶ 33, 41-44 (alleging misrepresentations by Defendant and staff about agreements with clients); ¶¶ 34-36 (alleging misrepresentations made by Defendant to outside auditors); ¶¶ 37-38 (alleging misrepresentations by internal accounting to Plaintiff and upper management); ¶ 52 (alleging misrepresentations by Defendant to Plaintiff about collectability of investment fees).

On December 22, 2020, Defendant submitted a declaration (the "statement" or "Declaration") to the SEC that allegedly falsely blamed Plaintiff for Defendant's aforementioned misconduct. *Id.* ¶ 57. Although Plaintiff does not attach the Declaration to his Complaint, he alleges that it contains defamatory statements, including statements that the TCA Group did not have an investment banking department, no one on staff could provide the services outlined in the IBSAs, and that Plaintiff was aware of all of it. *Id.* ¶ 57. Plaintiff contends that these statements were false because Plaintiff relied in good faith on Defendant to hire staff and run the investment banking side of the business. *Id.* ¶¶ 58-60. Plaintiff further alleges that, in the Declaration, Defendant "falsely claimed . . . that [Plaintiff] was aware of the financial condition of the companies that signed IBSAs and knew most of the investment banking fees recorded were uncollectible." *Id.* ¶ 61. Plaintiff says that Defendant lied and hid information in order to

conceal his own fraudulent conduct. *See id.* ¶ 62. Plaintiff further contends, without any details, that Defendant "caused these false statements to be repeated to third parties including the SEC," but does not identify any third parties other than the SEC. *Id.* ¶ 68.

Plaintiff alleges he was damaged by the Declaration submitted to the SEC. He contends that, not only did it harm his reputation in his trade and expose Plaintiff to public ridicule, but as a result of Defendant's statements, Plaintiff "was compelled to reach a settlement with the SEC, without admitting or denying any of the substantive allegations, in order to put this matter behind him." *Id.* ¶ 63; *see id.* ¶ 69. The Complaint does not indicate on what date, or in what context, this settlement was reached.

On December 21, 2021, Plaintiff filed the instant defamation action. *See generally* Compl. Defendant filed a motion to dismiss on September 6, 2022. ECF No. 27. On September 22, 2022, the case was reassigned to the undersigned. ECF No. 31. On September 30, 2022, Plaintiff filed his opposition to the motion to dismiss. *See generally* Opp. On October 7, 2022, Defendant filed his reply brief. *See generally* Reply.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009)). The Court draws all reasonable inferences in the plaintiff's favor, and accepts as true all non-conclusory allegations of fact. *Id.* However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In making this determination, a court is generally limited to the "facts stated on the face of the complaint," as well as "documents appended to the complaint or incorporated in the complaint by reference," "matters of which judicial notice may be taken," and documents "integral" to the complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal citations omitted); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." (internal citation and quotation marks omitted)). Finally, "[w]hile the Court must accept the facts as alleged in the complaint, 'when any allegations contradict the evidence contained in the documents relied upon by a plaintiff, the documents control, and the Court need not accept the allegations contained within the complaint as true.'" *Zoulas v. N.Y. City Dep't of Educ.*, 400 F. Supp. 3d 25, 48 (S.D.N.Y. 2019) (quoting *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002)).

## DISCUSSION

### I. Judicial Notice

As an initial matter, the parties dispute the information the Court may consider in evaluating the motion to dismiss. Defendant argues that the Court should take judicial notice of two documents: (1) a complaint for injunctive and other relief, filed in the Southern District of Florida by the SEC against TCA Group, TCA Global Credit Fund GP, LTD., and related entities,

5

on May 11, 2020 (*see* ECF No. 19-1 or "Injunction Complaint"); and (2) an Order Instituting Administrative and Cease-and-Desist Proceedings, which was filed on September 30, 2021 in an administrative proceeding before the SEC, captioned *In the Matter of Robert D. Press* (*see* ECF No. 19-2 or "SEC Order"). *See* Br. at 2-3. Plaintiff objects to the consideration of the Injunction Complaint and SEC Order at the motion to dismiss stage because they are extrinsic to the Complaint.[2] Opp. at 17-19. Plaintiff primarily argues that the Injunction Complaint and SEC Order are not integral to the Complaint. *Id.* at 18.

Pursuant to Federal Rule of Evidence ("FRE") 201(b), a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).[3] Also, under FRE 201, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." FRE 201(c)(2). "[M]atters of which the court takes judicial notice are not considered matters outside the pleadings; the Court may consider them when adjudicating a motion to dismiss without converting the motion to dismiss into a motion for summary

---

[2] Plaintiff also objects to emails that Defendant attached to his declaration filed with his motion to dismiss. *See* Opp. at 17-18. Although Defendant cites to some of these emails in his papers, *see, e.g.*, Br. at 6 n.4 & n.5, he does not ask the Court to take judicial notice of them. The Court does not consider these emails for purposes of evaluating this motion to dismiss.

[3] While Defendant acknowledges the applicability of FRE 201(b) to the instant proceedings (*see* Br. at 2-3), Plaintiff – without justification – cites to state law standards for evaluating judicial notice (*see* Opp. at 17-19). The Court will apply the federal procedural evidentiary rule for judicial notice here. Plaintiff has not articulated a conflict between FRE 201 and state law, nor offered any other basis to apply state procedural law for evaluating judicial notice. *See id.*; *see also Margolies v. Rudolph*, No. 21-cv-02447 (SJB), 2022 WL 2062460, at *9 (E.D.N.Y. June 6, 2022) (noting that FRE 201 will likely apply to matters of judicial notice because, "[s]ince no court has concluded that the original Federal Rules of Evidence were not a valid exercise of [c]ongressional authority, the Supremacy Clause analysis will inexorably result in the application of the federal rule over the state procedural rule of evidence").

6

judgment." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, . . . matters of which a court may take judicial notice."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("Of course, [the court on a motion to dismiss] may also consider matters of which judicial notice may be taken under [FRE] 201."). The Second Circuit has made clear that a court may take judicial notice of publicly filed documents, not "offered for the truth of the matter asserted," but instead offered for other relevant reasons, such as "to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings . . . ." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Both documents at issue here satisfy the standard for judicial notice. The Injunction Complaint was filed on the public docket in the Southern District of Florida on May 11, 2021. *See* Compl., *SEC v. TCA Fund Mgmt. Grp. Corp. et al.*, 20-cv-21964 (CMA) (S.D. Fl. May 11, 2020), ECF No. 1. While the Injunction Complaint, by its nature, contains only allegations, the date and fact of its filing "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2). Courts in this District routinely take judicial notice, on a motion to dismiss, of public filings like this, including filings made on court dockets. *See, e.g.*, *Thompson v. Glob. Contact Servs., LLC*, 20-cv-00651 (MKB), 2021 WL 3425378, at *5 (E.D.N.Y. Aug. 4, 2021) ("The State Court Class Action Complaint, Notice, Order Notice, and State Court orders granting preliminary and final approval of the Settlement Agreement can be considered on this motion because they are public court records routinely considered on

7

motions to dismiss."). Accordingly, the Court takes judicial notice of the date and the fact of the filing of the Injunction Complaint.

The SEC Order was also publicly available as of September 30, 2021, as part of the SEC's administrative proceedings, and is available in the SEC's online archives. *See Robert D. Press*, Release No. 33-10991, File No. 3-20610, (SEC Sept. 30, 2021) (available at https://www.sec.gov/litigation/admin.htm). Again, the date and fact of its filing "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2). Indeed, courts in this District routinely take judicial notice, on a motion to dismiss, of public filings, such as deferred prosecution agreements entered with the Department of Justice, *see, e.g.*, *Sullivan v. Barclays PLC*, No. 13-cv-02811 (PKC), 2017 WL 685570, at *21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of deferred prosecution agreement with the Department of Justice), and – like the SEC Order here – a company's settlement with the SEC, *see, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15-cv-02106 (ER), 2017 WL 1169629, at *1 n.2 (S.D.N.Y. Mar. 28, 2017) ("The Court also takes judicial notice of the Deferred Prosecution Agreement entered into between SQM and the Department of Justice and SQM's settlement with the SEC on January 13, 2017."). Therefore, as with the Injunction Complaint, the Court takes judicial notice of the date and the fact of the filing of the SEC Order. *See, e.g.*, *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 159 n.1 & n.2 (S.D.N.Y. 2021) (taking judicial notice of federal pleadings and SEC filings to establish the filing of those documents, not for the truth of the matters contained therein).

**II.     Choice of Law**

The next initial matter that the Court must address is the state law applicable to this diversity action. Defendant asserts that Florida or New Jersey law should apply, and Plaintiff contends that New York law should apply.

"In diversity cases, federal courts apply the choice of law rules of the forum state[.]" *Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d Cir. 2003); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The Court therefore applies the choice of law rules of New York. Under that regime, the Court must first determine whether there is a conflict between the defamation laws of New York, Florida, and New Jersey, and in particular, the standard for absolute privilege, which is at issue here. *See Kesner*, 515 F. Supp. 3d at 167; *see also Matter of Allstate Ins. Co.* (*Stolarz*), 81 N.Y.2d 219, 223 (1993) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."). The parties do not address whether there is a conflict between the litigation privilege laws in New York, Florida, or New Jersey; in fact, they do not even acknowledge this preliminary step, but instead simply argue for the law of different states to apply. Nevertheless, upon a careful review of the case law in these states, the Court discerns important differences: these states do not all appear to evaluate, in the same way, the question of absolute privilege to allegedly defamatory statements made in the preliminary or investigative stage of a judicial or quasi-judicial proceeding, which could be relevant here given the timing of the December 2020 Declaration prior to the SEC Order. *See supra* Section III.

Both New York and New Jersey law recognize an absolute privilege with respect to communications that are preliminary and related to a judicial or quasi-judicial proceeding. *See Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359, 367-68 (2007) (concluding that "compulsory" form

filed as part of the "preliminary or first step" in an administrative, quasi-judicial process was protected by absolute privilege); *Able Energy, Inc. v. Marcum & Kliegman LLP*, 893 N.Y.S.2d 36, 37 (1st Dep't 2010) (concluding that a letter to the SEC's finance division that "potentially could be used by the SEC in a quasi-judicial proceeding" was protected by absolute privilege because "[i]t is irrelevant whether or not the SEC actually commenced such a proceeding"); *Hawkins v. Harris*, 141 N.J. 207, 216 (1995) (concluding that absolute privilege is "not limited to statements made in a courtroom during a trial; it extends to all statements or communications in connection with the judicial proceeding" including pretrial investigations such as "preliminary conversations and interviews between a prospective witness and an attorney" (internal citation omitted)).

The law in Florida is more unsettled, with courts scrutinizing the type of communication, the context in which it was made, and policy considerations in determining whether a qualified or absolute privilege applies to statements that are preliminary to a judicial or quasi-judicial proceeding. *See, e.g.*, *Fridovich v. Fridovich*, 598 So. 2d 65, 68 (Fla. 1992) (concluding that qualified, not absolute, privilege applies to "preliminary investigations" prior to a criminal judicial proceeding); *DelMonico v. Traynor*, 116 So. 3d 1205, 1218 (Fla. 2013) (concluding that qualified, not absolute, privilege applies to an examination under oath that occurred outside the formal discovery process of litigation); *BOCA Invs. Grp. v. Potash*, 835 So.2d 273, 276 (Fla. 3d Dist. 2002) (Cope, J. concurring) (stating "the question of what privilege applies to pre-suit communications will evolve under case law, depending on the type of communication and the policy considerations involved"); *Wilmington Trust v. Gonzalez*, 15-cv-23370 (UU), 2015 WL 13847162, at *6 (S.D. Fla. Dec. 22, 2015) (observing that "without any clear directive from the Florida Supreme Court," "[a]pplication of the privilege remains unsettled in circumstances

relevant to communications sent prior to the commencement of judicial proceedings"). Thus, Florida appears to have narrowed its application of the absolute privilege depending on where, when, and under what circumstances the statements were made in relation to a judicial or quasi-judicial proceeding. *See, e.g.*, *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1111 (M.D. Fla. 2019) (explaining the limited application of a litigation privilege to statements that are made "necessarily preliminary" to a judicial proceeding). The parties do not address these differences in state law.

Because there is a conflict, the Court must turn to New York's choice of law rules to determine which state's law should govern this action. "In tort cases, New York applies the law of the state with the most significant interest in the litigation," considering whether a rule is "conduct-regulating" or "loss-allocating." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (internal citations and quotation marks omitted). Because "[d]iscouraging defamation is a conduct regulating rule," the law of the situs of the tort usually applies. *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999). This presumption exists because New York choice of law principles for conduct-regulating rules look to the "jurisdiction [that] has the greatest interest in regulating behavior within its borders" – which is "usually the state where the tort occurred." *Kesner*, 515 F. Supp. 3d at 168 (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)). In defamation cases, the tort generally occurs where the harm occurs: in the state where the plaintiff is domiciled. *See Adelson v. Harris*, 973 F. Supp. 2d 467, 476 (S.D.N.Y. 2013) ("Because 'the locus of the tort is where the plaintiff suffered injury, often the Court can resolve the choice of law analysis [in a defamation action] simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state.'" (quoting *Condit v. Dunne*, 317 F. Supp. 2d 344, 353 (S.D.N.Y.2004))).

11

However, if "an allegedly defamatory statement is published nationally," the "presumptive rule that the law of [the] plaintiff's domicile applies" will not apply "if with respect to the particular issue, some other state has a more significant relationship to the issue or the parties." *Kinsey*, 991 F.3d at 177 (quoting *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014)).  In those cases, a court must consider whether a state that is *not* the plaintiff's domicile "has a more significant relationship to the case." *Kesner*, 515 F. Supp. 3d at 168.  To make this determination, "New York courts weigh all the factors that might impact on the interests of various states in the litigation to make a choice of law determination, including where the plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply." *Id.* (internal citation and quotation marks omitted).

New York choice of law rules require the application of Florida law to this action.  As noted, the presumptive choice of law for a defamation case is the domicile of the plaintiff, the place where the injury occurred. *See Adelson*, 973 F. Supp. 2d at 476.  Plaintiff is domiciled in Florida.  Florida has "a strong policy interest in having its defamation laws applied to protect [P]laintiff, its resident, from the allegedly defamatory statements of outsiders." *Catalanello*, 18 F. Supp. 3d at 512 (internal citation and quotation marks omitted).  Therefore, Florida law presumptively applies here.

Plaintiff asks the Court to nevertheless apply the law of New York because Defendant's "wrongful conduct" took place there, Defendant was employed by Plaintiff in New York, and Plaintiff's reputation was injured there. *See* Opp. at 7-9.  In support, Defendant relies primarily on *Kesner*. *Id.*  In *Kesner*, even though the plaintiff was domiciled in Florida and sought the

12

application of Florida law, because the allegedly defamatory statements had been published nationally on the defendant's website, the court considered a variety of factors, and ultimately concluded that the presumption in favor of Florida law was outweighed by New York's more significant relationship to the case. *Kesner*, 515 F. Supp. 3d at 168-69. Unlike in *Kesner* and related cases, however, Plaintiff has not alleged – or even argued in his papers – that the allegedly defamatory Declaration was published nationally. When a defamatory statement is nationally published, "the tort essentially lacks a locus, but rather injures plaintiff everywhere at once." *Condit*, 317 F. Supp. 2d at 353. That is not the case here. Plaintiff has only alleged that Defendant submitted the Declaration to the SEC, and then vaguely states that Defendant "caused . . . false statements to be repeated to third parties including the SEC." Compl. ¶ 68; *see also* Opp. at 8 (alleging that Defendant "'defamed [Plaintiff] to other third parties,' separate and apart from his direct statements to the SEC" (quoting Compl. ¶ 8)). But, there are no allegations that Defendant published the Declaration nationally, and Plaintiff has not identified any third parties. Indeed, in response to Defendant's argument that Florida law should apply in part because the statement was published to the Miami, Florida office of the SEC (Br. at 9), Plaintiff only argues that the "SEC is a national agency that is headquartered and sits in Washington, D.C." (Opp. at 8). This does not support an inference of a national publication akin to that discussed in *Kesner*.

Because there are no allegations that the Declaration was published nationally, there is no basis to disregard the presumption to apply the law of Plaintiff's domicile – Florida law. Plaintiff has not pointed to any case law that supports disregarding the presumption that the law of the plaintiff's domicile applies in a defamation claim where the statement is not published nationally. Other facts also support Florida's significant interest in this case. Plaintiff worked

13

out of the TCA Group's office in Florida, Compl. ¶¶ 6, 60, where the company was headquartered, *id.* ¶ 16. The Injunction Complaint was filed in Florida, names TCA Group as a defendant, and lists attorneys with the SEC located in Florida on the signature page. *See* Injunction Complaint at 1, 18. Because there are no allegations that the Declaration was disseminated nationally, the Court concludes that because Plaintiff is domiciled in Florida, and his business – the apparent subject of the Declaration and SEC investigation – is based in Florida, Florida has the most significant interest in the litigation.[4] Thus, Florida law applies.

### III. Analysis

Under Florida law, "[t]o state a claim for common law defamation, a plaintiff must allege that '(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff.'" *Turner v. Wells*, 198 F. Supp. 3d 1355, 1364 (S.D. Fla. 2016) (quoting *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x. 863, 865 (11th Cir. 2015)). Defendant does not dispute that Plaintiff has alleged these elements. *See generally* Br. Instead, Defendant argues that any allegedly defamatory statements are absolutely privileged because they were made during the course of a quasi-judicial proceeding. *See id.* at 8-9. Plaintiff disagrees that the statements are absolutely privileged, but asserts that such a determination should not be made on a motion to dismiss. Opp. at 9-19. Importantly, "Florida courts have also made it abundantly clear that any affirmative defense, including the litigation

---

[4] Even if the Court were to consider the interests of the other states, they do not outweigh the interests of Florida. Defendant worked for Plaintiff in New York. Plaintiff further contends that the defamatory statements relate to activities that took place in New York and that his reputation was damaged in New York, "the center of the financial world," as well as internationally. *See* Opp. at 8; *see also* Compl. ¶¶ 55-61. Those contentions do not establish that New York's interest is more significant than the substantial interest of Florida in protecting its residents from defamation. Finally, the only connection to New Jersey is that Defendant is domiciled there. Compl. ¶ 11. The Court can discern no policy interest New Jersey has in this case, and any minimal interest it may have is not sufficient to overcome the interests of Florida.

privilege, may be considered in resolving a motion to dismiss when the complaint affirmatively and clearly shows the conclusive applicability of the defense to bar the action." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1277 (11th Cir. 2004) (internal citation and quotation marks omitted).

Under Florida law, absolute privilege shields statements from being subject to defamation lawsuits that are "made either in front of a judicial officer or in pleadings or documents filed with the court or quasi-judicial body." *DelMonico*, 116 So. 3d at 1217; *see also Gursky Ragan, P.A. v. Ass'n of Poinciana Vills., Inc.*, 314 So. 3d 594, 595 (Fla. Dist. Ct. App. 2020) ("In other words, defamatory statements are absolutely privileged when they are (1) published *in the course of* judicial proceedings and (2) bear some relation to or connection with the subject of inquiry." (emphasis added)). Florida courts apply this privilege to statements made during judicial proceedings because, "[i]n these more formalized judicial settings, the presence of safeguards facilitates and promotes an unimpeded speaking environment while protecting an individual from false or malicious statements[.]" *DelMonico*, 116 So. 3d at 1217. For example, the privilege applies to affidavits filed in court, *see Zuccarelli v. Barfield*, 165 So. 3d 830, 832 (Fla. Dist. Ct. App. 2015), and statements made during a deposition, *McCullough v. Kubiak*, 158 So. 3d 739, 740 (Fla. Dist. Ct. App. 2015). Importantly, in *quasi*-judicial proceedings, the privilege will also apply to statements so long as there are "protection[s] against abuse" in the process, such as where the proceeding is "adversarial in nature and the opposing side has an opportunity to immediately object to any untrue statements." *DelMonico,* 116 So. 3d at 1217. Again, these safeguards protect the subject of the allegedly defamatory statement, while also permitting the absolute privilege to work "as a mechanism for discovering truth . . . ." *Id.* at 1218.

Florida law is less clear with respect to statements made prior to, or during the investigation phase, of a judicial or quasi-judicial proceeding. *See, e.g.*, *Wilmington Tr., N.A.*, 2015 WL 13847162, at *6 ("Application of the privilege remains unsettled in circumstances relevant to communications sent prior to the commencement of judicial proceedings.") (collecting cases). More recent case law from Florida applies only a *qualified* privilege to statements made either in the investigative phase of a judicial or quasi-judicial proceeding, or outside of the formal discovery process during the course of a judicial or quasi-judicial proceeding. *See Fridovich*, 598 So. 2d at 68 (qualified privilege applied to statements made to police officers during murder investigation); *DelMonico*, 116 So. 3d at 1218 (qualified privilege applied to statements made under oath to attorney outside of formal discovery). Such a qualified privilege will apply if the statements are "connected with or related to the subject of inquiry in the underlying lawsuit." *DelMonico*, 116 So. 3d at 1219. In the context of qualified privilege, if a statement is related to an underlying suit, "the burden [shifts to] . . . the plaintiff to then prove the additional element of express malice" to overcome that privilege. *Id.*; *see also* Opp. at 12-13.

Plaintiff argues that an absolute privilege does not protect Defendant's statement here because the Declaration was not made during a judicial or quasi-judicial proceeding in which safeguards were present, and even if a qualified privilege applies, the Declaration was made with malice. *See* Opp. at 12-14. In terms of the proceedings at issue here, on May 11, 2020, the SEC initiated an action in federal court, an undisputable judicial proceeding, with respect to the TCA Group. *See* Injunction Complaint.

Moreover, the administrative proceeding commenced by the SEC against Plaintiff, as described in the SEC Order filed on September 30, 2021, is a quasi-judicial proceeding. "The SEC has statutory authority to enforce the nation's securities laws . . . [including] by instituting

16

an administrative proceeding against an alleged wrongdoer." *Lucia v. SEC*, 138 S. Ct. 2044, 2049 (2018).  A civil penalty or other relief may be imposed as part of those administrative proceedings, or as part of a cease-and-desist proceeding, only "on the record after notice and opportunity for [a] hearing." 15 U.S.C. § 78u-2(a)(1)-(2); *see* 15 U.S.C. § 78o(b)(4); 15 U.S.C. § 78u-3(a)-(b).  If a final order issues as part of the SEC's administrative proceedings, a "person aggrieved by a final order of the Commission . . . may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit . . . ." 15 U.S.C. § 78y(a)(1); *see also id.* 15 U.S.C. § 78y(b)(1).  Therefore, the aggrieved party has access to judicial review of the SEC's actions. *See, e.g.*, *Altman v. U.S. SEC*, 768 F. Supp. 2d 554, 558 (S.D.N.Y. 2011); *see also Tilton v. SEC*, 824 F.3d 276, 286-87 (2d Cir. 2016) (concluding "appellants will have access to meaningful judicial review of their Appointments Clause claim through administrative channels" in the SEC and later judicial review).  In sum, the SEC administrative proceeding process provides for "notice and opportunity for [a] hearing," is "adversarial in nature[,] and the opposing side has an opportunity to immediately object to any untrue statement." *DelMonico*, 116 So. 3d at 1217. The SEC's final determination is also ultimately subject to judicial review, as is the trial court's determination in a judicial proceeding.  *See Altman*, 768 F. Supp. 2d at 558.  Together, these features serve as protective measures that permit the absolute privilege to apply to an SEC administrative proceeding.

Statements made in the course of a quasi-judicial SEC administrative proceeding would therefore be absolutely privileged under Florida law, which comports with findings in other analogous administrative contexts.  For instance, in *Gandy v. Trans World Computer Technology Group*, the court held that affidavits filed in response to an EEOC investigation were absolutely

17

privileged because they "were published for the purpose of and relevant to the EEOC inquiry . . . ." 787 So. 2d 116, 119 (Fla. Dist. Ct. App. 2001).  An absolute privilege has also been held to apply to letters that pertained to a pending administrative proceeding before the National Labor Relations Board ("NLRB").  *See, e.g.*, *Weitzner v. U.S. Precast Corp.*, 645 So. 2d 180, 181 (Fla. Dist. Ct. App. 1994).

Here, the Court is unable to determine from the allegations in the Complaint and the judicially-noticed facts whether or not the allegedly defamatory Declaration was made in the course of, or prior to, a judicial proceeding, like that contemplated by the Injunction Complaint, or a quasi-judicial proceeding, like that contemplated by the SEC Order.  The Declaration here was made on December 22, 2020, between the filing of the Injunction Complaint and the SEC Order.  Compl. ¶ 57.  It is not clear from the facts alleged whether the Declaration was made in the course of either of those proceedings.  To be sure, the facts alleged suggest that the statement was likely made in connection with some sort of investigation related to one or both of those proceedings.  For instance, Plaintiff alleges that he initiated an internal investigation in January 2020, after he learned that a whistleblower complaint had been filed with the SEC.  *Id.* ¶ 28.  He further alleges that this investigation would be "side-by-side" with the SEC's investigation into the whistleblower complaints.  *Id.*  Thus, the Complaint makes clear that the SEC had initiated an investigation into TCA Group as early as January 2020.  Then, in May 2020, as the Injunction Complaint demonstrates, the SEC filed an action in federal court against the TCA Group.  *See* Injunction Complaint.

Over one year later, on September 30, 2021, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings before the SEC captioned *In the Matter of Robert D. Press*.  *See* SEC Order.  The SEC Order instituted an agreed-up resolution to the

administrative proceeding with Plaintiff.  *See generally id.*; *see also* Compl. ¶ 63 (alleging Plaintiff reached a settlement with the SEC).  Plaintiff himself pleads that the statements by Defendant "compelled [Plaintiff] to reach a settlement with the SEC, without admitting or denying any of the substantive allegations, in order to put this matter behind him."  Compl. ¶ 63.  This timeline suggests that Defendant's December 2020 Declaration was made in relation to an investigation by the SEC – after the commencement of one judicial proceeding (the Injunction Complaint in federal court), and prior to the commencement of another quasi-judicial proceeding (the administrative proceeding contemplated by the SEC Order).

As previously described, Florida law appears to differentiate between statements made prior to, versus during the course of, a proceeding.  At the very least, that area of law is unsettled enough in Florida that more facts are necessary to fully evaluate whether an absolute or qualified privilege would apply here.  Thus, the Court cannot conclude which privilege applies to the Declaration at this early stage of the litigation.  *See Uganda v. Est. of Tonder*, No. 2:21-cv-00916 (JES) (NPM), 2022 WL 3369496, at *3 (M.D. Fla. Aug. 16, 2022) (denying motion to dismiss on privilege grounds where it was unclear if the statement was "made in judicial proceedings or necessarily connected to the litigation"); *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 633 (E.D.N.Y. 2018) (denying motion to dismiss on absolute privilege grounds because of "ambiguity regarding the timing and scope of the [statement]" made to an insurance company).  The parties will need to develop a factual record clarifying when the Declaration was made, under what circumstances it was made, when proceedings were instituted and what they entailed, and any other information that may be relevant to whether a qualified or absolute privilege may apply.  *See Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11-cv-06353 (CM), 2012 WL 2376466, at *14 (S.D.N.Y. June 20, 2012) ("To prove that its statements to eBay and

to its former authorized dealers were 'part of' the instant judicial proceeding, Bel Canto will need to introduce factual material into the record that is not properly considered on a motion to dismiss."). Furthermore, if a qualified privilege ultimately applies, there are fact issues regarding malice that could not be decided on a motion to dismiss.

## CONCLUSION

For the reasons stated herein, Defendant's motion to dismiss is DENIED. IT IS HEREBY ORDERED that Defendant shall file its answer to Plaintiff's claim no later than **21 days** after the date of this Opinion and Order. IT IS FURTHER ORDERED that, within **14 days** of service of the Answer, the parties shall file a proposed Civil Case Management Plan and Scheduling Order, which is available at **https://www.nysd.uscourts.gov/hon-jennifer-l-rochon**.

Dated: August 3, 2023
       New York, New York

                                           SO ORDERED.

                                           *Jennifer Rochon*
                                           _____
                                           JENNIFER L. ROCHON
                                           United States District Judge